1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MARK E.,

                              Plaintiff,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

                              Defendant.

Case No.:  21cv655-GPC(KSC)

**REPORT AND RECOMMENDA-
TION**

        On April 14, 2021, plaintiff Mark E. commenced an action pursuant to Title 42, United States Code, Section 405(g), against Andrew M. Saul,  the Commissioner of Social Security, seeking review of a final adverse decision of the Commissioner.[1] [Doc. No. 1.]  Currently before the Court is the parties' Joint Submission.  In the Joint Submission, plaintiff seeks a reversal and remand of the Commissioner's final decision. [Doc. No. 17, at p. 23.]  Defendant argues that the Commissioner's final decision should be affirmed because it is supported by substantial evidence and free of legal error.  [Doc.

---

[1]      Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi, who became the Acting Commissioner of Social Security on or about June 9, 2021, is automatically substituted in place of Andrew Saul as the defendant in this suit.

No. 17, at p. 23.]  For the reasons outlined more fully below, IT IS RECOMMENDED that the District Court DENY plaintiff's request for a remand and GRANT defendant's request to affirm the Commissioner's final non-disability determination.  [Doc. No. 17.]

### I.   *Background and Procedural History.*

Plaintiff filed an application for Social Security disability insurance benefits on January 5, 2016 alleging he was disabled as of October 28, 2014, and had stopped working on this date because of his medical condition.  [Doc. No. 11-5, at p. 2.]  At this time, plaintiff's claimed medical conditions included a low back injury; a neck injury; ADD; and depression.  [Doc. No. 11-6, at p. 5.]  In a Function Report submitted in connection with his application, plaintiff represented that sciatic nerve pain prevented him from doing "most everything involving moving, sitting, [and] standing," including cooking, personal care, and driving.  [Doc. No. 11-6, at p. 27-30.]  Plaintiff's application for benefits was denied on April 7, 2016.  [Doc. No. 11-4, at pp. 2-5.]  He then submitted a request for reconsideration on June 7, 2016, which was denied on July 22, 2016.  [Doc. No. 11-4, at pp. 6, 7-11.]

On September 22, 2016, plaintiff requested a hearing, and a hearing was then held before an ALJ on May 30, 2018.  [Doc. No. 11-4, at p. 12; Doc. No. 11-2, at p. 61.]  In a written decision dated September 12, 2018, the ALJ concluded plaintiff is not eligible for disability benefits, because he was not disabled under Social Security regulations from October 28, 2014, his alleged date of onset, through the date of the ALJ's decision.  [Doc. No. 11-2, at p. 54.]  Plaintiff then requested review of the ALJ's decision by the Appeals Council, but the Appeals Council concluded in a letter dated June 4, 2020, that there was no basis for changing the ALJ's decision.  [Doc. No. 11-2, at pp. 35-36; Doc. No. 11-2, at pp. 5-8.]  Therefore, the ALJ's denial became the final decision of the Commissioner. Plaintiff then filed his Complaint in this action on April 14, 2021 seeking review of the ALJ's decision.  [Doc. No. 1.]

/ / /

/ / /

## II.   *Standards of Review.*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record.  *Id.*  If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

## III.   *The Administrative Record.*

### A.   *Summary of the Administrative Hearing.*

At the administrative hearing, the ALJ heard testimony from plaintiff; plaintiff's ex-wife, Stacey Eastman, who lives in the same household as plaintiff and their three children; and Gloria Lasoff, a vocational expert.

### 1.   *Plaintiff's Testimony.*

Plaintiff testified that he previously worked as a farmers' market vendor selling fruits and vegetables; a swim and fitness instructor; and a fitness consultant.  [Doc. No. 11-2, at pp. 66-68.]  He stopped working in October of 2014 after injuring his lumbar spine, mid back, and neck in a motor vehicle accident.  [Doc. No. 11-2, at p. 69.] Initially, plaintiff was treated by a chiropractor but later had an MRI when he did not get better.  He had pain radiating down his right leg into his foot and had difficulty walking. On July 13, 2015, he had surgery, which "took the edge off" of his pain, but "did not fix the problem well enough."  [Doc. No. 11-2, at pp. 69-71.]  His pain has improved with "PRP injection[s]" and other types of therapy, such as Egoscue exercises; Epsom salt

soaks; a decompression and inversion table; and myofascial release.  However, if he "mess[es] up," he returns to a "pain cycle" that can take months to reverse. [Doc. No. 11-2, at pp. 71-73.]  Although he has a prescription for Hydrocodone, he has not "taken it in a while" because he does not like like the side effects, and it does not "really touch the pain well enough to justify constantly ingesting it." [Doc. No. 11-2, at pp. 72-73.]  He previously had a prescription for Gabapentin, but it was not effective.  [Doc. No. 11-2, at p. 73.]  He is not currently taking either of these medications.  [Doc. No. 11-2, at pp. 72-73.]

Plaintiff does not believe he would be able to work because he has a tough time standing and sitting for long periods of time.  He has tried typing while laying on his back to see if he could do a "data entry" job, but his neck "is crooked up and that causes a lot of pain in the spine" and sends him into a "pain cycle," so he cannot do it for very long. [Doc. No. 11-2, at p. 73.]  He can stand for a short walk of 10 to 15 minutes or stand for a few minutes to cook a meal but then has to rest.  After taking a car ride for "a couple hours," plaintiff said he "was pretty inflamed" and it lasted "a couple days." [Doc. No. 11-2, at pp. 73-74.]  He can sit for 20 to 30 minutes; take a short walk for about 15 minutes; cook a simple meal for about 20 minutes; "chip in" with laundry; and drive for ten minutes at a time to take the kids to and from school.  If he is not doing therapy or chores, he is lying down to rest.  [Doc. No. 11-2, at pp. 73-76.]  For most of the day, plaintiff testified that he is "just lying still." [Doc. No. 11-2, at p. 75.]  He estimated he is lying down for about 14 hours a day.  [Doc. No. 11-2, at p. 75.]

## 2.   *Testimony of Plaintiff's Ex-Wife.*

Plaintiff's ex-wife, who lives with plaintiff and their three children, was asked to describe what her husband does during the day.  She said he takes an Epsom salt bath for an hour or two; does Egoscue and other therapeutic exercises for two to four hours; helps supervise the children; goes to the gym to swim or for hot or cold therapy; makes a meal; lies down; and picks up the kids from their school about ten minutes away from home. [Doc. No. 11-2, at pp. 77-79.]

### 3.   *Vocational Expert's Testimony.*

The vocational expert was asked to consider an individual of plaintiff's age, education, and work experience, who could lift or carry ten pounds occasionally and less than ten pounds frequently; sit for six hours; stand or walk for two hours; push or pull but never climb ladders, ropes or scaffolds; occasionally perform other postural activities; and avoid exposure to wetness, vibrations, and unprotected heights or dangerous moving machinery. [Doc. No. 11-2, at pp. 84-85.] The vocational expert testified that such an individual could not perform plaintiff's prior relevant work but could do sedentary work as a document preparer; table worker; or production worker and that these jobs exist in significant numbers in the national economy. [Doc. No. 11-2, at p. 85.] If such an individual could alternate between sitting, standing, and walking, light jobs, such as that of "cashier II" and "assembler," would also be available in significant numbers in the national economy. [Doc. No. 11-2, at pp. 85-87.] However, if such an individual was "off task for 15% or more of a work schedule" because of "constant position changes or the need for rest outside of the normal rest periods," no jobs would be available. [Doc. No. 11-2, at p. 88.]

### B.   *Summary of Medical Treatment Records.*

Plaintiff's medical records indicate he was in a motor vehicle accident in October 2014. While stopped, his vehicle was rear ended by another vehicle that was traveling at a high speed. Aches and pains came on gradually after the accident. [Doc. No. 11-7, at p. 3.] On March 31, 2015, plaintiff was evaluated by a chiropractor for treatment of hip and low back pain that was radiating down his right leg; frequent headaches; and pain and spasms in his upper back and neck. [Doc. No. 11-7, at p. 78.]

Plaintiff had an orthopedic consultation on April 2, 2015 and reported he had increasing low back pain that was intermittently radiating down his right leg all the way to his foot and weakness in lifting the great toe on his right foot. [Doc. No. 11-7, at pp. 3-4.] The orthopedic doctor was most concerned about the weakness plaintiff was experiencing in his right ankle and right great toe, so he ordered MRIs for his right hip

and lumbrosacral spine.  [Doc. No. 11-7, at p. 5.]  An MRI of the lumbrosacral spine revealed "a rather huge central and right pericentral disk extrusion at L4-L5, which was causing right-side neuroforaminal narrowing."  [Doc. 11-7, at p. 6.]  The orthopedic doctor concluded that the MRI results explained plaintiff's "right let symptomatology." [Doc. No. 11-7, at p. 6.]  Various treatment options were discussed, but plaintiff was advised that "the only thing that will cure the lumbosacral spine is surgery," so plaintiff was referred to a spine surgeon.  [Doc. No. 11-7, at p. 6.]

On July 13, 2015, plaintiff had "minimally invasive" surgery on his back at Alvarado Hospital to address the herniated disc at L4-L5.  There were no complications. [Doc. No. 11-7, at pp. 13-14.]  A progress report dated August 12, 2015 notes there was "neurological improvement."  [Doc. 11-7, at p. 13.]  However, plaintiff's gait was markedly antalgic and he was using a crutch.  There was a 1 cm atrophy of the right calf compared with the left, and plaintiff was still having "significant persistent pain" that appeared to be mainly from the hip.  An intra-articular injection and continued physical therapy were recommended.  [Doc. No. 11-7, at pp. 36-37.]

A second progress report dated October 22, 2015 states that plaintiff continued to have "significant persistent pain." [Doc. No. 11-7, at p. 33.  He had only had a 30 percent response from a right hip injection, and his right hip was only "a minor component of his pain."  [Doc. No. 11-7, at p. 34.]  There was concern that he may have "residual disc material or his L5-S1 spondylolisthesis may be symptomatic."  [Doc. No. 11-7, at p. 34.] An "L spine" MRI was ordered to evaluate "persistent right back and leg pain."  [Doc. No. 11-7, at p. 34.]  The MRI confirmed "L5-S1 spondylolisthesis" that "could result in neural foraminal narrowing affecting the exiting L5 nerve roots."  [Doc. No. 11-7, at p. 46.]  Thereafter, "serial selective injections" were ordered "for both diagnostic and therapeutic purposes."  [Doc. No. 11-7, at p. 31.]

On December 16, 2015, plaintiff sought treatment for chronic headaches and chronic neck and back pain plus intermittent numbness in his hands and the soles of his feet.  His lower back pain was reportedly 8 out 10 and neck pain was 6 out of 10.  He was

unable to work or to sit or stand for more than 15 minutes. [Doc. No. 11-7, at p. 62.] He felt like his legs and grip strength were weaker and he had resorted to a sedentary lifestyle. A physical examination revealed limited flexion and extension with lots of pain, but his grip strength was 5 out of 5. Plaintiff was referred to pain management, physical therapy, and neurology. Norco was prescribed for pain. [Doc. No. 11-7, at pp. 62-63.]

At a pain management consultation on December 29, 2015, plaintiff said he had 8 out of 10 numbing, shooting, and sharp pains in his lumbar spine and right leg. The pain was exacerbated by prolonged sitting or standing but improved with walking. As conservative therapies had failed, steroid injections were recommended but plaintiff elected to hold off on injections and get a second surgical opinion. Plaintiff was started on a "Medrol dose pack," Celebrex, and Gabapentin, and his prescription for Norco was refilled, but the "overall goal" was to address his pain with steroid injections and non-opiod medications. [Doc. No. 11-7, at pp. 66-68.]

On January 13, 2016, plaintiff reported to his primary care doctor that he was taking Advil three times a day and Norco about twice per day as needed. He planned to start physical therapy and to have a neurological examination "to look into hand numbness." [Doc. No. 11-7, at p. 60.] At this time, his overall sense of well-being was "much better." [[Doc. No. 11-7, at p. 60.] He was to continue walking for exercise as tolerated. [Doc. No. 11-7, at p. 60.]

In a report to the Department of Social Services dated February 5, 2016, plaintiff's chiropractor stated plaintiff had been treated with spinal adjustments, manual traction, mechanical massage, and myofascial therapy for severe right low back and hip pain that radiated down the right leg to his ankle; frequent headaches; and neck and upper back pain. The chiropractor reported that when plaintiff was evaluated on March 31, 2015, he was unable to walk on his heels; perform "bilateral leg lower" or lumbar range of motion due to pain. His movements were guarded and he made vocal and facial expressions of pain when he moved. [Doc. No. 11-7, at pp. 78-79.] However, the chiropractor's notes

21cv655-GPC(KSC)

state that plaintiff's "subjective symptoms appear to exceed his exam findings." [Doc. No 11-7, at p. 79.] After evaluation and treatment on March 31, 2015, plaintiff did not return to this chiropractor for any additional care. [Doc. No. 11-7, at p. 79.]

On February 6, 2016, plaintiff established care with another health care provider with new health care coverage and requested a referral to pain management and an early refill of Percocet pending consultation with a pain management specialist. At this time, plaintiff was using crutches for ambulation and had an unstable gait. Straight leg raises increased radicular pain. The doctor advised him of the "local narcotic policy" and limited a refill of his pain medication to a two-week supply. Plaintiff was also referred to neurology for further diagnostic and intervention studies. [Doc. No. 11-7, at pp. 14-16.]

On February 9, 2016, plaintiff had a Platelet Rich Plasma Autologous Graft treatment that was injected into his right iliolumbar ligaments and sacroiliac joint. [Doc. No. 11-7, at p. 88.]

On February 11, 2016, plaintiff sought treatment of pain from a new chiropractor for stabbing, aching pain, as well as cramping and tingling, in his lower back. The chiropractor noted that plaintiff's "prognosis is guarded and uncertain" as there was no change after the adjustment. The chiropractor recommended spinal "decompression treatments" until he returns to pre-accident functioning. [Doc. No. 11-7, at p. 142.] These treatments continued on a frequent basis until June 30, 2016. [Doc. No. 11-7, at pp. 128-142.] However, plaintiff did not respond well to these treatments. The final treatment note from June 30, 2016 states plaintiff was "not responding to treatment" and his "condition is failing to change as was expected." [Doc. No. 11-7, at p. 128.] It was the chiropractor's view that plaintiff would need additional surgery, and he reported to the Department of Social Services in a letter dated July 5, 2016 that plaintiff had functional limitations in "sitting, lifting, twisting and traveling." [Doc. No. 11-7, at p. 127.]

On March 23, 2016, plaintiff returned to the place where he had the Platelet Rich Plasma Autologous Graft treatment. The notes from the visit state that plaintiff had

"great success" from the treatment and was "down to one pain pill a day from eight." [Doc. No. 11-7, at p. 87.] The notes also indicate plaintiff "is now doing physical activities and exercising such as swimming. He is also doing decompression." [Doc. No. 11-7, at p. 87.]

On April 18, 2016, plaintiff's chief complaints were lower back pain and "bilateral hand numbness" that was "symmetric bilaterally and mostly in the 4.5 digits and occasionally the thumb." [Doc. No. 11-7, at p. 90.] Plaintiff also indicated he had neck pain and "radicular symptoms to the triceps mostly at night when he is sleeping." [Doc. No. 11-7, at p. 90.] However, the treatment notes states there was "[n]o loss of strength or muscle atrophy in his hands." [Doc. No. 11-7, at p. 90.] An MRI of the cervical and lumbar spine areas and an EMG/NCV study of both upper extremities were recommended, and plaintiff was directed to follow up with a pain specialist. [Doc. No. 11-7, at pp. 91-92.]

On June 7, 2016, an EMG and a motor nerve conduction study were completed because plaintiff was complaining of "bilateral hand numbness in digits 4-5." [Doc. No. 11-7, at p. 93.] The results were "mildly abnormal." [Doc. No. 11-7, at p. 93.] According to the report, "[t]here is electrodiagnostic evidence of an active left C3 radiculopathy possibly subacute. No evidence of entrapment neuropathy or peripheral neuropathy was present on the study." [Doc. No. 11-7, at p. 93.] Additionally, results of motor nerve conduction and sensory nerve conduction studies were "normal." [Doc. No. 11-7, at p. 93.]

On July 7, 2016, plaintiff had a consultation with a certified neurosurgeon for a neurosurgical opinion. The surgeon's report indicates plaintiff still had "symptomatic cervical radiculopathy" and "lumbar radiculopathy" despite conservative treatments and the passage of time. [Doc. No. 11-7, at p. 145.] A physical examination was completed, and the surgeon's report includes the following notations concerning plaintiff's motor strength: "4+/5 right knee flexion, knee extension, foot dorsiflexion, plantar flexion, and EHL. 5/5 bilateral digit flexion, digit extension, deltoid, bicep, and tricep. The patient is

right-hand dominant." [Doc. No. 11-7, at p. 146.]  As to grip strength, plaintiff reportedly had "90/90/90 kg of force in his dominant right hand and 60/60/60 kg of force in his left hand." [Doc. No. 11-7, at p. 146.]  Severe back pain and spasm were noted with "positive straight leg raising bilaterally." [Doc. No. 11-7, at p. 146.]  An examination of the cervical spine revealed "significant neck pain and spasm." [Doc. No. 11-7, at p. 146.]  The surgeon also reviewed plaintiff's MRI results from May 23, 2016.  Based on his evaluation, the surgeon recommended a trial of physical therapy and a diagnostic CT scan of the lumbar spine.  He indicated there was potential for surgical intervention of the cervical spine, as well as the lumbar spine (*i.e.*, a transforaminal lumbar fusion at L4-S1).

Treatment notes from plaintiff's primary care provider dated August 30, 2016 indicate plaintiff was participating in physical therapy and was interested in having epidural injections to treat his pain. [Doc. No. 11-8, at p. 92.]  His prescriptions for Norco and Gabapentin were refilled. [Doc. No. 11-8, at p. 95.]  He was opposed to taking any NSAIDs because a physician who performs stem cell therapy told him NSAIDs would interfere with circulation at the injection site. [Doc. No. 11-8, at p. 95.]

In a follow-up appointment on October 31, 2016, plaintiff reported "significant improvement" in his back pain since starting "Egoscue physical therapy exercises 6 weeks ago." [Doc. No. 11-8, at p. 89.]  The therapy involves "menus" of exercises provided to him by a physical therapist over the phone.  Plaintiff reported he met with a pain management specialist but had declined interventional therapies (epidural or steroid injections), as well as stem cell therapy, because of his pain improvement.  However, plaintiff did say that his pain is aggravated by prolonged sitting and he is taking Norco for breakthrough pain. [Doc. No. 11-8, at p. 89.]  His gait was normal; the range of motion in his lumbar spine was "near normal;" and he was moving "all extremities well." [Doc. No. 11-8, at p. 90.]  Plaintiff's prescriptions for Norco and Gabapentin were refilled, but the doctor told plaintiff he could not "indefinitely refill narcotic analgesics" unless there was "some sort of treatment plan." [Doc. No. 11-8, at p. 90.]

On November 28, 2016, the Social Security Disability Office in San Diego received two handwritten notes.  The first was apparently written by a physician's assistant, stating that plaintiff has a lumbar and cervical spine condition and has the following work restrictions:  No lifting greater than 20 pounds; avoid prolonged sitting, standing, or walking; and minimize bending and twisting of the lumbar spine.  [Doc. No. 11-7, at p. 47.]  The second handwritten note was apparently written by a physical therapist and is dated October 21, 2016.  The note states that plaintiff participated in physical therapy for back pain in July 2016 and has a history of lumbar spine surgery.  Because of his condition, the note states that plaintiff has "functional limitations" in his ability to lift, and sit and walk for prolonged periods.  [Doc. No. 11-7, at p. 149.]  The ALJ afforded the opinions in these notes "little weight," because they were not made by physicians and because they conflict with "substantial evidence" in the record.  [Doc. No. 11-2, at pp. 50-51.]

Plaintiff had a follow-up appointment with his primary care physician on February 22, 2017 and sought a second surgical evaluation from neurology; chiropractic care; aqua therapy; and prescription refills.  He described "right radicular pain affecting the right hip, right arm, as well as weakness in the right lower extremity," and he said he was wearing a back brace when sedentary.  [Doc. No. 11-8, at p. 84-87.]  The treatment notes state plaintiff was not being followed by a pain management specialist and had declined interventional therapies at his previous visit.  Although detailed testing was not done, the treatment notes state plaintiff had an antalgic gate but was moving all extremities well.  Plaintiff's prescriptions for Norco and Gabapentin were refilled.  [Doc. No. 11-8, at p. 87.]

An MRI of the lumbar spine completed on April 29, 2017 concluded plaintiff had "[m]ild to moderate multilevel degenerative changes . . . including an annular fissure within L2-L3 disc."  [Doc. No. 11-8, at pp. 108-109.]  Thereafter, on May 3, 2017, plaintiff indicated to his primary care physician that he wanted to continue with conservative, non-surgical treatment.  [Doc. No. 11-8, at p. 23.]

Plaintiff had an initial visit with a chiropractor on July 21, 2017 and described level 2 out of 10 pain (a "dull ache") that could reach 8 out of 10 at its worst in his lower back, right hip, and buttocks with no radiation of pain into his legs. [Doc. No. 11-8, at p. 69.] He said that the pain was "constant, every day" and was "getting worse as time goes by." [Doc. No. 11-8, at p. 69.] The pain was aggravated by bending, lifting, and sitting or standing for too long and relieved by stretching, massage, trigger point therapy, manipulation, and swimming. Plaintiff also described moderate, level 4 pain in his neck that is "getting worse" and "comes and goes" about 2 to 3 times per week. [Doc. No. 11-8, at p. 69.] The treatment goals were to reduce pain levels from 2 out of 10 to 1 out of 10 and to increase strength and flexibility so that plaintiff could "optimally perform all activities of daily living." [Doc. No. 11-8, at p. 70.]

Following the initial visit with the chiropractor on July 21, 2017, the record indicates that plaintiff continued with treatments on a regular basis through April 20, 2018. [Doc. No. 11-8, at pp. 2-4, 5-6, 7-8, 9-10, 15-16, 16-18, 19-20, 21-22, 23-24, 25-26, 32-33, 34-35, 35-37, 42-43, 44-45, 45-47, 48-49, 56-57, 58-59, 66-68.] During these visits, the treatment goals remained the same, and all pain was classified by the chiropractor as "moderate." Plaintiff's remarks at these visits varied -- "about the same;" "a little better;" "getting worse;" "[e]xcellent, working out at the gym again." [*See, e.g.,* Doc. No. 11-8, at pp. 48, 58, 66.] On October 20, 2017, plaintiff remarked that the "treatment always helps," but he still has "stiffness and pain." [Doc. No. 11-8, at p. 41.]

On November 8, 2017, plaintiff complained to his primary care physician of pain and tightness in the third finger on his left hand and said he may have broken his finger a few months back. The interphalangeal joint was tender and slightly swollen, and he was unable to completely close his finger while making a fist, so x-rays were ordered. [Doc. No. 11-8, at pp. 38-40.] The treatment notes state that: "Typically finger pain will improve over time." [Doc. No. 11-8, at p. 40.] Plaintiff also complained of "mild sciatic pain when bending his head down or bending forward" and "tight hip flexors." [Doc. No. 11-8, at p. 38.] Plaintiff also reported he had been receiving epidural stem cell therapy

and "PRP"[2] for lumbar pain and requested an "interval MRI" to determine whether or not the treatments had been beneficial. [Doc. No. 11-8, at p. 38.] At this time, plaintiff was no longer taking Gabapentin and was only taking Norco "occasionally" for pain. [Doc. No. 11-8, at p. 38.]

On November 10, 2017, plaintiff told the chiropractor that he had not had any "major flare-ups;" that he had "tingling in his fingers;" and that his neck, lower back, middle back, hips, and knees were sore. [Doc. No. 11-8, at p. 36.] Plaintiff also reported tingling and soreness in his fingers on December 1, 2017 [Doc. No. 11-8, at p. 34]; December 15, 2017 [Doc. No. 11-8, at p. 32]; and April 20, 2018 [Doc. No. 11-8, at p. 5 ("the tingling and pain into the hands is increasing, treatment is helping but it always comes back").

In a follow-up appointment on December 20, 2017, plaintiff reported to his primary care physician that he had "[m]ild sciatic pain when bending his head down or bending forward; he was "occasionally" taking Norco for pain; he was receiving chiropractic treatments which were "very beneficial;" epidural stem cell therapy; and "PRP" for lumber back pain. [Doc. No. 11-8, at p. 27.] Plaintiff also said he "spends much of his days doing self-directed therapy for his back, including sitting in a hot tub, followed by sitting in cold pool water, and exercising at the gym." [Doc. No. 11-8, at p. 27.] The treatment note further states as follows: "Overall back pain has significantly improved." [Doc. No. 11-8, at p. 27.]

On February 3, 2018, a follow-up MRI of the lumbar spine was completed. The conclusion states as follows: "Stable mild to moderate degenerative changes of the lumbar spine which are most significant at the L4-L5 and L5-S1 level where there is moderate right neural foraminal stenosis at L4-L5 and mild right neural foraminal stenosis at L5-S1. Stable grad 1 anterolisthesis of L5 on S1." [Doc. No. 11-8, at p. 107.]

---

[2]     Based on prior records discussed above, "PRP" stands for Platelet Rich Plasma injections.

1     The final primary care treatment note in the record is dated March 22, 2018, and it

2 states that plaintiff was asking for a letter "stating specific disabilities," because he is

3 unable to care for his special needs child," and his "ex-wife needs assistance vis-à-vis

4 IHSS." [Doc. No. 11-8, at p. 11.]  Plaintiff said "he does self-directed therapy for his

5 back all day long" and is also receiving chiropractic care.  [Doc. No. 11-8, at p. 10.]  He

6 reported "[s]ciatic pain when bending his head down or bending forward."  [Doc. No. 11-

7 8, at p. 11.]  Additionally, plaintiff reported that his back pain was improving "overall"

8 until very recently when he took a road trip in the car, which made his back pain worse.

9 Prescriptions for both Gabapentin and Norco are listed as "discontinued" in this treatment

10 note.  [Doc. No. 11-8, at p. 10.]  The physical examination section of the treatment note

11 states that plaintiff's back has a "normal spinal contour [and a] normal sitting posture"

12 but forward flexion was "limited to about 70 degrees."  [Doc. No. 11-8, at p. 13.]

13 Plaintiff was able to rotate his back "fully in both directions."  [Doc. No. 11-8, at p. 13.]

14 Additionally, plaintiff was able to move "all extremities well;" had no obvious

15 neurological abnormalities; and had a normal gait.  [Doc. No. 11-8, at p. 13.]

16     Finally, the record includes a form entitled "Physical Medical Source Statement"

17 that is dated May 4, 2018 and that was completed and signed by Carmen Bellofatto.  The

18 form does not include any credentials for Ms. Bellofatto but does indicate it was

19 submitted for the record by plaintiff's attorney.  [Doc. No. 11-8, at pp. 111, 114.]  The

20 form indicates that Ms. Bellofatto provided some therapy to plaintiff in six sessions from

21 September 9, 2016 through May 4, 2017.  [Doc. No. 11-8, at p. 111.]  Symptoms listed

22 on the form include "neck, jaw, tingling down arms, right shoulder pain, right low

23 back/hip pain that radiates down to his calf" and that increases with sitting and standing.

24 [Doc. No. 11-8, at p. 111.]  The therapy included gentle stretching and strengthening to

25 address plaintiff's "postural imbalances."  [Doc. No. 11-8, at p. 111.]

26     According to Ms. Bellofatto, plaintiff could walk one to two blocks; sit for 10 to 15

27 minutes; and stand for 15 to 20 minutes but needed to take unscheduled breaks of 30

28 minutes often and shift positions at will during an 8-hour work day because of pain.

21cv655-GPC(KSC)

[Doc. No. 113, at pp. 112-113.]  The form also indicates that plaintiff could occasionally twist and climb stairs but should rarely lift more than 10 to 20 lbs; never crouch or climb ladders; and rarely stoop.  [Doc. No. 11-8, at p. 113.]  Ms. Bellofatto also reported on the form that plaintiff had significant limitations with reaching, handling, or fingering; would likely be "off task" about 25 percent of the time; and needed to spend most of the day lying on his back.  [Doc. No. 11-8, at p. 114.]  The ALJ afforded "little evidentiary weight" to this opinion, because it was not not made by a physician; is not based on objective medical findings; does not include a medical diagnosis; and appears to be based on the claimant's subjective complaints.  Additionally, the ALJ noted Ms. Bellofatto had limited involvement in the case.  [Doc. No. 11-2, at p. 51.]

### C.   *Non-Treating, Non-Examining Medical Opinions.*

The ALJ gave "great weight" to the following medical opinions because they were "largely consistent with the physical exam record as a whole" and consistent with "the overall medical evidence of record" [Doc. No. 11-2, at pp. 50, 52]:

On April 6, 2016, G. Spellman, M.D., an agency physician, reviewed plaintiff's medical records and concluded plaintiff is not disabled and could perform his past relevant work as a consultant (a sedentary job), because he has the residual functional capacity to do the following in an 8-hour work day:  occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and or walk for 2 hours; sit for about 6 hours; push and pull to use hand and/or foot controls on an unlimited basis; occasionally climb stairs, balance, stoop, kneel, and crouch or crawl; and never climb ladders.  [Doc. No. 11-3, at pp. 10-14.]

On July 14, 2016, K. Vu, an agency physician, reviewed plaintiff's medical records and concluded he is not disabled because he has the residual functional capacity to occasionally lift or carry 10 pounds; frequently lift or carry less than 10 pounds; stand or walk for 2 hours and sit for about 6 hours in an 8-hour work day; push and pull hand or foot controls on an unlimited basis; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  However, Dr. Vu noted plaintiff should avoid vibration "due to

C3 radiculopathy." [Doc. No. 11-3, at pp. 23-26.] It was Dr. Vu's opinion that plaintiff's statements about his symptoms were partially consistent with the medical evidence in the record. His notations also refer to "improvement," hip [range of motion with no pain]; and "no atrophy of quads or calfs." [Doc. No. 11-3, at p. 22.]

## IV.   *The ALJ's Decision.*

The ALJ followed the Commissioner's five-step sequential evaluation process for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a). At steps one and two, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since October 28, 2014, and he has the severe impairments of "status post motor vehicle accident October 28, 2014 with degenerative disc disease and degenerative joint disease of the lumbar spine; status post minimally invasive L4-L5 foraminotomy/discectomy surgery; osteoarthritis of the bilateral hips; and degenerative disc disease of the cervical spine." [Doc. No. 11-2, at p. 42.] The ALJ also concluded that plaintiff's depression (also referred to as "affective disorder") does not significantly limit his ability to perform basic work activities. [Doc. No. 11-2, at p. 42.]

At step three, the ALJ concluded that plaintiff's impairments do not meet or equal any of the relevant listings in the SSA's Listing of Impairments. [Doc. No. 11-2, at p. 45.] At step four, the ALJ must determine the claimant's residual functional capacity to work based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). Residual functional capacity is "the most [an applicant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). As part of this assessment, the ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).

Here, the ALJ concluded plaintiff is unable to perform his past relevant work as a farmer's market vendor. [Doc. No. 11-2, at pp. 52-53.] However, the ALJ did conclude plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except that he has the capacity to lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours in an 8-hour workday with

normal breaks; push and pull within the lift and carry restrictions; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but never climb ladders, ropes, or scaffolds.  Additionally, the ALJ concluded plaintiff must avoid concentrated exposure to wetness, vibration, and hazards, such as unprotected heights or dangerous moving machinery.  [Doc. No. 11-2, at p. 45.]

At step five, the ALJ must consider the residual functional capacity assessment, along with the applicant's age, education, and work experience, to determine whether the applicant could "make an adjustment to other work" that is available in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 1382c(a)(3)(B).  While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

At step 5, the ALJ relied on the vocational expert's testimony and determined that plaintiff would be able to perform the representative sedentary occupations of document preparer; table worker; and production worker, which are available in significant numbers in the national economy.  Thus, the ALJ determined plaintiff is not disabled.

## V. *Discussion.*

### A. *Hand Numbness.*

Plaintiff argues "there is competent evidence detailing how cervical disc degeneration impairs plaintiff's ability [to] handle and grasp," but the ALJ overlooked or mischaracterized this evidence.  As a result, plaintiff contends the ALJ's RFC should have included limitations on plaintiff's ability to perform fine and gross manipulation, which would have lead to a conclusion that he could not sustain competitive work.  [Doc. No. 17, at pp. 7-8.]  In support of these arguments, plaintiff refers the Court to a number of treatment records from 2015 and 2016, as well as the results of an MRI and an EMG. [Doc. No. 17, at pp. 7-10.]  Additionally, plaintiff argues that the ALJ rejected his complaints of "hand pain and numbness" and "limited hand use" without clear and convincing evidence.  [Doc. No. 17, at pp. 16-20.]

Defendant argues that the ALJ appropriately concluded and explained in his decision that the weight of the medical evidence, including diagnostic testing and clinical findings, did not substantiate manipulative limitations due to numbness in plaintiff's hands. [Doc. No. 17, at p. 14.]  Defendant contends, and the Court agrees, that plaintiff's argument should be rejected, because he only cites "isolated excerpts" and "single instances" from the record indicating, for example, that he had "a slightly reduced grip strength" and "decreased sensation," but ignores conflicting evidence, such as treatment records stating he had "full strength, full sensation, and intact deep-tendon reflexes." [Doc. No. 17, at p. 14.]  Defendant also disputes plaintiff's contention that an EMG test supports his argument because it shows "active left C3 radiculopathy" when there is nothing pointing to any "evidence that C3 radiculopathy causes hand numbness."  [Doc. No. 17, at p. 15.]  Rather, based on information in a publicly available article cited in Footnote 3, defendant claims that "C3-related symptoms appear to involve the neck and trapezious."  [Doc. No. 17, at p. 15.]

Based on a thorough review of the record, it is clear that plaintiff complained of "tingling" or numbness in his hands on a number of occasions.  However, plaintiff did not cite, and the Court was unable to locate, any testimony or other statements by plaintiff indicating he was in any way limited in his ability to use his hands or his upper extremities because of numbness, tingling, or pain in his hands.  Rather, plaintiff's application for benefits, the written statements he made in support of his claim, and his testimony at the hearing before the ALJ largely point to neck pain, low back pain, and trouble with sitting, standing, and walking as the basis for his disability claim.  [Doc. No. 11-6, at pp. 5, 27-29; 61; 68; 93-94; 93-100.]  Additionally, the Court was only able to locate two notations in the record that mention hand "pain," as opposed to mere numberness or tingling.  The first of these references to pain was on November 8, 2017, when plaintiff told his doctor he had pain and tightness in the third finger on his left hand and may have broken it a few months back.  The doctor noted plaintiff had some swelling and was unable to completely close his finger while making a fist, so he ordered x-rays

and indicated that finger pain typically improves over time.  [Doc. No. 11-8, at pp. 38-40.]

The second reference was located in notes from a visit to the chiropractor on April 20, 2018, which states that "the tingling and pain into the hands is increasing" and "treatment is helping but it always comes back."  [Doc. No. 11-8, at p. 5.]  The chiropractor recommended plaintiff follow up with his primary care physician "to assess the tingling and pain in the hands."  [Doc. No. 11-8, at p. 5.]  However, as noted above, an EMG and a motor nerve conduction study had already been completed on June 7, 2016 for this specific purpose, and the results were only "mildly abnormal."  [Doc. No. 11-7, at p. 93.]

There is also nothing from which the Court could conclude the ALJ ignored or mischaracterized evidence regarding plaintiff's complaints of numbness, tingling, or pain in his hands.  In this regard, the ALJ addressed this topic in a single paragraph and concluded that "[d]iagnostic findings do not substantiate the claimant's complaints of ***significant*** bilateral hand numbness."  [Doc. No. 11-2, at p. 48 (emphasis added).]  In support of this conclusion, the ALJ referred to two documents.  First, the ALJ referenced treatment notes from an office visit plaintiff had with his primary care physician on April 18, 2016.  Plaintiff's chief complaints were lower back pain and "bilateral hand numbness" that was "symmetric bilaterally and mostly in the 4.5 digits and occasionally the thumb."  [Doc. No. 11-7, at p. 90.]  Plaintiff also indicated he had neck pain and "radicular symptoms to the triceps mostly at night when he is sleeping."  [Doc. No. 11-7, at p. 90.]  However, the treatment notes states there was "[n]o loss of strength or muscle atrophy in his hands."  [Doc. No. 11-7, at p. 90.]  An MRI of the cervical and lumbar spine areas and an EMG/NCV study of both upper extremities were recommended, and plaintiff was directed to follow up with a pain specialist.  [Doc. No. 11-7, at pp. 91-92.]

Second, the ALJ referenced the results of an EMG and a motor nerve conduction study that were completed on June 7, 2016 because plaintiff complained of "bilateral hand numbness in digits 4-5" during the visit to his doctor on April 18, 2016 referenced

1    above.  [Doc. No. 11-7, at p. 93.]  The results were "mildly abnormal." [Doc. No. 11-7,

2    at p. 93.]  According to the report, "[t]here is electrodiagnostic evidence of an active left

3    C3 radiculopathy possibly subacute.  No evidence of entrapment neuropathy or peripheral

4    neuropathy was present on the study." [Doc. No. 11-7, at p. 93.]  Additionally, the

5    results of the motor nerve conduction and sensory nerve conduction studies were

6    "normal." [Doc. No. 11-7, at p. 93.]

7         Without more, such as notations indicating that "active left C3 radiculopathy" is a

8    likely cause of plaintiff's hand numbness, it is unclear how the ALJ could have reached

9    the different or opposite conclusion that plaintiff's complaints of numbness in his hands

10   were both significant and substantiated by objective medical evidence.  In this regard, the

11   Court notes that the results of the EMG and motor nerve conduction study from June 7,

12   2016 were part of the record at the time Dr. Vu, an agency physician, reviewed plaintiff's

13   medical records on July 14, 2016.  [Doc. No. 11-3, at pp. 21-26.]  Dr. Vu concluded

14   plaintiff is not disabled, and his notes specifically reference and credit the June 7, 2016

15   results by stating that plaintiff should "avoid vibration due to C3 radiculopathy." [Doc.

16   No. 11-3, at p. 24.]  Dr. Vu did not recommend any other limitations to plaintiff's RFC

17   based on these results.  [Doc. No. 11-2, at p. 45.]  Nor are there any conflicting medical

18   opinions in the record to support plaintiff's contention that the ALJ's RFC should have

19   included limitations on plaintiff's ability to "handle and grasp" with his hands.  [Doc. No.

20   17, at pp. 7-8.]

21        Finally, where an ALJ "'determines that a claimant for Social Security benefits is

22   not malingering and has provided objective medical evidence of an underlying

23   impairment which might reasonably produce the pain or other symptoms she alleges, the

24   ALJ may reject the claimant's testimony about the severity of those symptoms only by

25   providing specific, clear, and convincing reasons for doing so.'  [Citations omitted.]

26   This requires the ALJ to 'specifically identify the testimony [from a claimant] she or he

27   finds not to be credible and . . . explain what evidence undermines that testimony.'

28   [Citations omitted.]" *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020).  As outlined

above, plaintiff has not submitted objective medical evidence of an underlying impairment that might reasonably cause disabling numbness or pain in his hands.  Nor does the record include testimony or statements by plaintiff of disabling numbness or pain that limited the use of his hands because of numbness or pain.  Therefore, contrary to plaintiff's contention, it is this Court's view that the ALJ was not required to cite specific, clear, and convincing reasons in support of his conclusion that plaintiff did not have limited use of his hands or upper extremities because of numbness or pain in his hands.  Therefore, for the reasons outlined above, it is this Court's view that substantial evidence supports the ALJ's RFC and his apparent conclusion that it was unnecessary to include any limitations in the RFC based on hand numbness or hand pain.

### B. *Ability to Sit During a Regular Workday.*

As noted above, the ALJ concluded plaintiff had the capacity to "perform sedentary work as defined in 20 CFR 404.1567(a)."  [Doc. No. 11-2, at p. 45.]  Section 404.1567(a) states as follows:  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Under Social Security Ruling 83-10, "'[o]ccasionally' means occurring from very little up to one-third of the time.  Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and ***sitting should generally total approximately 6 hours of an 8-hour workday***. . . ."  SSR 83-10 (emphasis added).  Additionally, Social Security Ruling 83-12 provides that a person who "must alternate periods of sitting and standing" (*i.e.*, an individual who can sit for a time, but must then get up and stand or walk before returning to sitting), "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the

relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)"  SSR 83-12.

Based on the foregoing, the ALJ concluded plaintiff could sit for approximately 6 hours of an 8-hour workday.  Plaintiff contends there is "compelling evidence" that supports a finding he is "unable to sit for prolonged periods" and requires "frequent breaks if seated." [Doc. No. 17, at pp. 5, 7.]  Plaintiff therefore believes the ALJ's RFC is "incomplete and fatally flawed" and should have resulted in a finding that he is disabled, because the Vocational Expert testified there would be no competitive work available for an individual who needed to change positions outside of the normal work breaks.  [Doc. No. 17, at pp. 5-8.]

Defendant argues that plaintiff has not established error because he has not identified any evidence compelling a finding that he is unable to sit for prolonged periods.  [Doc. No. 17, at p. 13.]  "No physician offered a medical opinion finding that plaintiff could not perform prolonged sitting or required any sit-stand option."  [Doc. No. 17, at pp. 13-14.]  "As the ALJ noted, plaintiff did assert he could sit for only 20 to 30 minutes before needing to adjust his position, but the medical evidence did not support any such finding."  [Doc. No. 17, at p. 14.]

Defendant argues that the ALJ was justified in relying heavily on the opinions of the state agency physicians because the medical evidence was "complex and conflicting" and because the weight of conflicting medical evidence supports the opinions of these physicians.  [Doc. No. 17, at pp. 11-12.]  Consistent with the opinions of these physicians, defendant contends the ALJ "assessed a highly restrictive and carefully tailored RFC" that included a number of appropriate restrictions.  [Doc. No. 17, at p. 12.]  Additionally, defendant notes the ALJ explained that his RFC was consistent with "other probative activities of daily living," including evidence that plaintiff took an active role in raising his children, drove them to school, assisted in household chores such as cooking

22

and laundry, and was able to swim and exercise for hours a day at a gym.  [Doc. No. 17, at p. 13.]  Defendant also notes the ALJ found that plaintiff's "longitudinal treatment records showed that his treatment was effective in stabilizing and improving his symptoms."  [Doc. No. 17, at p. 13.]

At the hearing before the ALJ, plaintiff testified he could sit for 20 to 30 minutes before he has to "make adjustments."  [Doc. No. 11-2, at p. 74.]  If he sits for longer periods, such as a two-hour car ride, he returns to a "pain cycle" for "a couple days." [Doc. No. 11-2, at p. 74.]  He also testified he typically only stands for 10 to 20 minutes at a time and is "lying still most of the day" (about 14 hours) when he is not doing chores or physical therapy exercises.  [Doc. No. 11-2, at pp. 73-75.]  However, it is apparent the ALJ did not find plaintiff's testimony believable because he and his wife made a number of inconsistent statements about plaintiff's daily activities and because there was a lack of medical evidence to support plaintiff's testimony.  In this regard, the ALJ's decision states as follows:

> The claimant testified that he is unable to work because of his limitations in standing and sitting for lengths of time.  He stated that he can walk 10-15 minutes and then needs to rest, and he can sit for approximately 20-30 minutes before needing to adjust his position.  He said that when he does not have appointments, he lays down at home for 14 hours a day.  However, the claimant also testified that he drives his children to school in the morning and is active in raising his children.  He also assists in the household chores, cooking and doing laundry.  He does physical exercising and stretching, including use of an inversion table.  His wife testified that he exercised for hours a day, goes to the gym to swim, and drives the children to and from school.  In sum, the testimony – to the extent it alleges a disabling condition – is largely inconsistent with the overall record.

[Doc. No. 11-2, at p. 46.]

The medical treatment records do indicate plaintiff reported difficulty with sitting. For example, on October 31, 2016, plaintiff reported that his pain was aggravated by prolonged sitting.  [Doc. No. 11-8, at p. 89.]  More recently, during an initial visit to a

21cv655-GPC(KSC)

chiropractor on July 21, 2017, plaintiff indicated his pain was aggravated by bending, lifting, and sitting or standing for too long.  [Doc. No. 11-8, at p. 69.]  However, as outlined more fully above, all pain reported and treated by this chiropractor during 2017 and 2018 was characterized as moderate.  (As noted above, the treatment goals with this chiropractor were to reduce pain levels from 2 out of 10 to 1 out of 10 and to increase strength and flexibility so that plaintiff could "optimally perform all activities of daily living.")  [Doc. No. 11-8, at p. 70.]

Contrary to plaintiff's contention, there is no "compelling evidence" to support a finding that he cannot sit long enough to perform a sedentary job.  As defendant points, there are no compelling medical opinions in the record indicating plaintiff should avoid prolonged sitting.  As outlined more fully above, the ALJ considered but justifiably afforded "little weight" to opinions by a physician's assistant and a physical therapist indicating plaintiff should avoid prolonged sitting.  These opinions conflicted with other evidence in the record and were not made by physicians.  [Doc. No. 11-2, at p. 51-52.]  The ALJ did give "some weight" to the opinion of a chiropractor who treated plaintiff in 2016 and reported that he had functional limitations in "sitting, lifting, twisting and traveling."  [Doc. No. 11-7, at p. 127.]  Although plaintiff did not respond well to the treatments in 2016, later treatment notes in 2017 and 2018 show a pattern of improvement, and this pattern is reflected in the ALJ's decision.

Lastly, the ALJ afforded "little weight" to the opinion of Carmen Bellofatto, who filled out a form dated May 14, 2018, indicating plaintiff had radiating pain down his leg that increases with sitting; could only sit for 10 to 15 minutes at a time; could only sit and stand for about 2 hours in an 8-hour workday; would need frequent unscheduled breaks; and would need "to spend most of the day lying on his back."  [Doc. No. 11-8, at pp. 111-114.]  The ALJ stated this opinion was not convincing, because it was not made by a physician; was not based on objective medical findings; did not include a medical diagnosis; and appeared to be based on the claimant's subjective complaints.  Additionally, the ALJ noted Ms. Bellofatto had limited involvement in the case (*i.e.*, the

form she completed states that she only had six visits with plaintiff between September 18, 2016 through May 4, 2017).  [Doc. No. 11-2, at p. 51, referring to Doc. No. 11-8, at pp. 111-114.]

Contrary to plaintiff's contention, these opinions, whether considered individually or all together, do not constitute "compelling evidence" that plaintiff could not sit for prolonged periods without taking frequent breaks.  Additionally, as the ALJ states throughout his decision, the objective medical evidence does not support a finding that plaintiff suffered from disabling symptoms, and two agency physicians concluded based on the medical records that plaintiff was not disabled.  Additionally, the records convincingly show improvement over time to a moderate level of pain in the low back and neck pain that rarely requires the use of pain medication, and an ability to engage in a wide range of physical activities on a daily basis, which included swimming and exercising at a gym.  In this Court's view, the ALJ's non-disability determination is supported by substantial evidence.

## *Conclusion*

Based on the foregoing, it is RECOMMENDED that the District Court DENY plaintiff's request for reversal and remand and GRANT defendant's request for affirmance of the final decision of the Commissioner, because the ALJ's RFC and non-disability determination are supported by substantial evidence.  [Doc. No. 17.]

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. Section 636(b)(1).  Within fourteen (14) days after being served with a copy of this Report and Recommendation, "any party may serve and file written objections."  28 U.S.C. § 636(b)(1)(B)&(C).  The document should be captioned "Objections to Report and Recommendation."  The parties

/ / /

/ / /

/ / /

/ / /

are advised that failure to file objections within the specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156-1157 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  January 30, 2023

Hon. Karen S. Crawford
United States Magistrate Judge

21cv655-GPC(KSC)