1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11

MARK EASTMAN,

                              Plaintiff,

12

13

v.

14

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

15

                              Defendant.

16

17

Case No.:  21cv655-GPC(KSC)

**ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION AND REMANDING TO THE COMMISSIONER**

**[Dkt. No. 17.]**

18

19

20

21

22

23

24

25

26

27

28

        On April 14, 2021, Plaintiff Mark Eastman ("Plaintiff"), with counsel, filed this action seeking review of the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act").[1]  (Dkt. No. 1.)  Pursuant to the Magistrate Judge's scheduling order, the parties filed a joint motion for judicial review.  (Dkt. Nos. 13, 17.)  On January 30, 2023, Magistrate Judge Karen S. Crawford issued a report and recommendation ("Report") that the Court affirm the Commissioner's decision.  (Dkt. No. 16.)  Plaintiff

---

[1] The complaint also claims to seek review of the Commissioner's final decision denying supplemental security income benefits ("SSI"), (Dkt. No. 1, Comp. ¶ 1.)  However, in this case, Plaintiff only filed a DIB claim and not an SSI claim.

1

filed Objections to the Report on February 21, 2023.  (Dkt. No. 21.)  Having carefully reviewed the parties' arguments, the Objections, the administrative record, and the applicable law, the Court ADOPTS in part and DECLINES to ADOPT in part the Report and REMANDS to the Commissioner for further administrative proceedings.

## Procedural Background

On January 5, 2016, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act alleging a disability date of October 28, 2014. (Administrative Record ("AR") 183-84.)  He alleged impairments regarding low back injury, neck injury, ADD (attention deficit disorder), and depression.  (AR 211.)

His application for disability was denied on April 7, 2016.  (AR 117-20.)  He requested reconsideration on June 7, 2016, which was denied on July 22, 2016.  (AR 121-26.)  On September 22, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Dkt. No. 11-4, AR 127.)  A hearing was held before ALJ Michael Richardson on May 30, 2018.  (Dkt. No. 11-2. AR 58-88.)  The ALJ heard testimony from Plaintiff, his ex-wife Stacey Eastman and a vocational expert.  (*Id.*)  On September 12, 2018, the ALJ rendered his decision and concluded that Plaintiff was not disabled under the Act.  (Dkt. No. 11-2, AR 39-53.)  Plaintiff requested review of the ALJ's decision by the Appeals Council which denied his request on June 4, 2020.  (Dkt. No. 11-2, AR 4-7.)  Therefore, the ALJ's decision is the final decision of the Commissioner of Social Security and subject to district court review.

## Factual Background

Plaintiff, a resident of San Diego, California, was born on July 5, 1976 and was 40 years old at the time of the onset of disability on October 28, 2014, and his highest education is two years of college.  (AR 208-12.)  He has past relevant work as a fitness consultant, a swim and fitness instructor, and a vendor.  (AR 212.)  In October 2014, Plaintiff was involved in a motor vehicle accident when he was rear-ended by another vehicle that was traveling at highway speed while he was stopped at the end of a freeway. (AR 316, 458.)  Plaintiff claims the following impairments: sciatic nerve pain prevents

him from moving, sitting, standing, and laying down except in a few select positions. (AR 233.)  He also states it's "too painful" for him to among other things, lift, squat, bend, stand, reach, walk, sit, kneel, and use his hands.  (AR 238.)  He takes Advil, hydrocodone, tramadol and Tylenol.  (AR 213.)  His date last insured was December 31, 2019.  (AR 208.)

**A.    Medical History**

> **1.    Treating Physicians' Medical Records**

On March 31, 2015, Plaintiff was evaluated by a chiropractor for treatment of right low back and hip pain that was radiating down his right leg to his right ankle with the inability to extend his right toes; frequent headaches; and pain and spasms in his mid-back, upper back and neck.  (AR 391.)  Plaintiff graded his pain as 20 using a 0-10 scale. (AR 391.)  On examination, the chiropractor reported Plaintiff was unable to walk on his heels on the right, there was no obvious lower extremity atrophy, he was unable to perform lumbar range of motion due to the pain and there was "moderate to marked right lower lumbar and S1 PVM spasm and trigger point pain with loss of segmental movement" and he was unable to perform "bilateral leg lower" due to pain.  (AR 391-92.)  His movements were guarded and he made vocal and facial expressions of pain when he moved.  (AR 391.)  As to the cervical examination, his motion was unrestricted but with pain in left lateral flexion and bilateral rotation.  (AR 392.)  There was also a "moderate cervical, upper and mid thoracic PVM spasm with trigger point pain and loss of segmental movement.  Foramina compression caused pain bilaterally."  (AR 392.) However, the chiropractor concluded that Plaintiff's "subjective symptoms appear to exceed his exam findings."  (AR 392.)

On April 2, 2015, Plaintiff was seen by Dr. William C. Holland, an orthopedist, who reported Plaintiff had increasing low back pain that was intermittently radiating down his right leg all the way to his foot, and weakness in lifting the great toe on his right foot.  (AR 316.)  On exam, Plaintiff presented with normal gait without abnormal back posture or limp, was able to walk on his heels and toes without much difficulty but had

difficulty extending the great toe, was able to perform a squat, his forward flexion was limited and there was no tenderness to palpation around the hip.  (AR 317.)  Dr. Holland was most concerned about the weakness Plaintiff was experiencing in his right ankle and right great toe, so he ordered MRIs for his right hip[2] and lumbrosacral spine.  (AR 318.)  An MRI of the lumbar spine revealed "a rather huge central and right pericentral disk extrustion at L4-L5, which was causing right-side neuroforaminal narrowing.  There was also a grade-1 retrolisthesis of L4 over S1 . . . ."  (AR 320, 321-22.)  Dr. Holland concluded that the MRI results explained Plaintiff's "right leg symptomatology."  (*Id.*)  Various treatment options were discussed, but Plaintiff was advised that "the only thing that will cure the lumbosacral spine is surgery," so Plaintiff was referred to a spine surgeon.  (*Id.*)

On July 13, 2015, Plaintiff had "minimally invasive" foraminotomy/diskectomy surgery on his back at Alvarado Hospital to address the herniated disc at L4-L5.  (AR 326-27.)  A progress report dated August 12, 2015 notes there was improvement in "neurological function" but he has "significant persistent pain" mainly from the hip.  (AR 350.)  Plaintiff's gait was markedly antalgic and he was using a crutch.  (AR 349.)  There was a 1 cm atrophy of the right calf compared with the left.  (AR 349.)  An intra-articular injection and continued physical therapy were recommended. (AR 350.)  Subsequent progress reports dated October 22, 2015 and November 25, 2015 noted Plaintiff's continued "significant persistent pain."  (AR 344, 347.)  He also had only a 30 percent response from a right hip injection conducted on October 26, 2015, and his right hip was only "a minor component of his pain."  (AR 343, 346.)  It was opined that Plaintiff may have "residual disc material or his L5-S1 spondylolisthesis may be symptomatic."  (AR 344, 347.)

---

[2] His insurance did not authorize the MRI of the right hip.  (AR 319.)

An x-ray of the lumbar spine, taken on October 13, 2015, showed "moderate degenerative disk disease at L4-L5" and a "grade 1 spondylolisthesis at L5-S1, possibly secondary to pars defect" that "could result in neural foraminal narrowing affecting the exiting L5 nerve roots." (AR 359.)  An MRI of the lumbar spine, taken on November 24, 2015, revealed some L4-L5 disk extrusion but was "much smaller" than pre-op, and "grade 1 anterolisthesis of L5 on S1 with likely L5 pars break." (AR 344, 355-56.)  Thereafter, "serial selective injections" were ordered "for both diagnostic and therapeutic purposes." (AR 344.)

Around November 28, 2015, Felix Regala, MPAP, PA-C wrote the following work restrictions for Plaintiff: no lifting over 20 pounds, avoid prolonged standing, walking and sitting and minimize bending and twisting at the lumbar spine.[3]  (AR 57, 360.)

On December 16, 2015, Dr. D. Scott Upton ("Dr. Upton"), Plaintiff's treating physician, saw Plaintiff for chronic headaches and chronic neck and back pain plus intermittent numbness in his hands and the soles of his feet.  (AR 375.)  His lower back pain was reportedly an 8 out of 10 and neck pain was 6 out of 10.  (AR 375.)  Plaintiff reported he was unable sit or stand for more than 15 minutes, his legs and grip strength were weaker and he had resorted to a sedentary lifestyle and could not work.  (AR 375.)  A physical examination of his back revealed lots of pain with limited flexion and extension with pain, but his grip strength was 5 out of 5 and strength testing of L4/5/S1 was 5 out of 5.  (AR 376.)  Plaintiff was referred to pain management, physical therapy, and neurology, and Norco was prescribed for pain.  (AR 375.)

On December 29, 2015, Plaintiff was referred to Dr. Douglas Dobecki ("Dr. Dobecki") at the San Diego Pain Institute, for pain management of his lumbar spine pain and right lower extremity pain.  (AR 379.)  At that visit, Plaintiff reported his pain as 8-10 out of 10 pain which he described as numbing, shooting, and sharp in his lumbar spine

---

[3] Besides a paragraph describing Plaintiff's work restrictions, there is no information as to the extent of Felix Regala's treatment of Plaintiff.

21cv655-GPC(KSC)

and right leg.  (AR 379.)  The pain was exacerbated by prolonged sitting, standing, flexion, extension, and rising from a seated position but improved with walking.  (AR 379.)  Because conservative therapies of physical therapy, ice, heat, home exercise, L4/5 right microdiscectomy, opioids, NSAIDs, had not worked, epidural steroid injections were recommended but Plaintiff elected to hold off on injections and get a second surgical opinion.  (AR 380.)  Plaintiff was started on a "medrol dose pack," Celebrex, and Gabapentin, and his prescription for Norco was refilled, but the "overall goal" was to address his pain with steroid injections and non-opiod medications.  (AR 380.)

In his follow up appointment with Dr. Upton on January 13, 2016, Plaintiff stated that he was taking two Advils a day and taking 2-3 tablets of Norco per day.  (AR 373.)  He started physical therapy and was getting a neurological appointment "to look into hand numbness."  (AR 373.)  It was noted that his overall sense of well-being was "much better."  (AR 373.)  He was to continue his physical therapy, neuro visits, and continue walking for exercise as tolerated.  (AR 373.)

From February 11, 2016 to June 30, 2016, Plaintiff was treated regularly by Richard Loos, D.C. ("Dr. Loos") for low back pain and spasms as well as discomfort in the left and right lumbar, and right and left pelvic.  (AR 439-55.)  During this time, he was treated 30 times for Spinal Decompression treatment but did not make any progress.  (AR 439.)  The final treatment note from June 30, 2016 reports that Plaintiff was "not responding to treatment" and his "condition is failing to change as was expected."  (AR 441.)  It was Dr. Loos' opinion that Plaintiff would need additional surgery.  (AR 441.)  On July 5, 2016[4], Dr. Loos assessed that Plaintiff's functional limitations included sitting, lifting, twisting and traveling and did not anticipate him to get any better.  (AR 439.)  Dr. Loos did not provide any specifics as to these functional limitations.

---

[4] Plaintiff states this report was on July 5, 2015 prior to the surgery, (Dkt.  No. 17 at 6); however, it appears to be July 5, 2016 after the surgery since Plaintiff did not begin seeing Dr. Loos until February 2016.  (AR 439.)

On February 9, 2016, Plaintiff had a Platelet Rich Plasma Autologous Graft treatment that was injected into his right iliolumbar ligaments and sacroiliac joint.  (AR 401.)  At that treatment, he complained of longtime lower back pain, and on exam, was tender in the "right iliolumbar ligament and lower SI joint."  (AR 401.)  On March 23, 2016, Plaintiff returned to have another Platelet Rich Plasma Autologous Graft injection into his right iliolumbar ligaments and sacroiliac joint.  (AR 400.)  At that visit, Plaintiff reported he had "great success" from the treatment and he was down to one pain pill a day from eight pills a day and now doing physical activities and exercising such as swimming.  (AR 400.)  On physical inspection, he had "[v]ery little tenderness in the right lower back."  (AR 400.)

On April 18, 2016, Plaintiff visited Dr. Richard Schumann ("Dr. Schumann"), a neurologist, and his chief complaints were lower back pain and "bilateral hand numbness" that was "symmetric bilaterally and mostly in the 4.5 digits and occasionally the thumb."  (AR 403.)  Plaintiff also indicated he had neck pain and "radicular symptoms to the triceps mostly at night when he is sleeping."  (AR 403.)  The treatment notes state there was "[n]o loss of strength or muscle atrophy in his hands."  (AR 403.)  On physical exam, Dr. Schumann described Plaintiff's cervical spine as abnormal and diagnosed him, *inter alia*, with "[c]ervical spondylosis with myelopathy and radiculopathy", "[c]ervicalgia" and "[u]lnar neuropahy at elbow."  (AR 404.)  He noted that Plaintiff has "progressive numbness in both hand in the ulnar distribution for the last few months."  (AR 404.)  An MRI of the cervical and lumbar spine areas and an EMG/NCV study of both upper extremities were recommended, and Plaintiff was directed to follow up with a pain specialist.  (AR 404-05.)

On June 7, 2016, an EMG and a motor and sensory nerve conduction study were completed due to Plaintiff's "bilateral hand numbness in digits 4-5" with "cervicalgia with radicular symptoms and MRI showing left C3 root impingement."  (AR 406.)  Motor nerve conduction studies of the bilateral medina and ulnar nerves were "normal", sensory nerve conduction studies were "normal", and needle exam of selected muscles of

the bilateral upper extremities were "normal." (AR 406.)  But the left upper cervical paraspinal muscle exam showed evidence of active denervation. (AR 406.)  Dr. Schumann found "[t]here is electrodiagnostic evidence of an active left C3 radiculopathy possibly subacute. No evidence of entrapment neuropathy or peripheral neuropathy was present on the study" and concluded the results were "mildly abnormal." (AR 406.)

On July 7, 2016, Plaintiff consulted with Dr, Sanjay Ghosh, M.D. ("Dr. Ghosh"), a board certified neurosurgeon, who indicated Plaintiff still had "symptomatic cervical radiculopathy" and "lumbar radiculopathy" despite conservative treatments and the passage of time. (AR 458.)  Upon physical examination, the neurosurgeon reported on Plaintiff's motor strength: "4+/5 right knee flexion, knee extension, foot dorsiflexion, plantar flexion, and EHL; . . . 5/5 bilateral digit flexion, digit extension, deltoid, bicep, and tricep." (AR 459.)  As to grip strength, Plaintiff reportedly had 90/90/90 kg of force in his dominant right hand and 60/60/60 kg of force in his left hand.[5] (AR 459.)  Severe back pain and spasm were noted with "positive straight leg raising bilaterally." (AR 459.)  He had slightly "diminished vibration sense in the thumb and index finger bilaterally." (AR 459.)  An examination of the cervical spine revealed "significant neck pain and spasm" with positive Spurling's test. (AR 459.)

On that visit, after reading the films and the report of an MRI of the cervical spine dated May 23, 2016, Dr. Ghosh indicated that the initial MRI report did not mention the "5 mm disc protrusion at C5-6 compression the left C6 nerve root.  There is a 3 mm disc protrusion at C5-6 compression the right C6 nerve root." (AR 459.)  Dr. Ghosh noted that an addendum to the report had been issued by a neuroradiologist. (AR 459.)

---

[5] Plaintiff challenges the findings that he had 90/90/90 kg of force in his dominant right hand and 60/60/60 kg of force arguing these results, in fact, show weakness because average grip strength for Plaintiff's age is 119.7 pounds so his grip strength was reduced by 50%. (Dkt. No. 17 at 18.)  However, Plaintiff relies on pounds rather than kilograms. 119.7 pounds equates to 54.3 kg.  Therefore, according to Plaintiff, his grip strength of 90/90/90 and 60/60/60 are above normal for his gender and age.

Dr. Ghosh concluded that Plaintiff suffers from "[l]umbar herniated nucleus pulposus at L4-5 with symptomatic lumbar radiculopathy", "[i]nstability at L5-S1 due to pars defect rendered symptomatic from the motor vehicle collision"; and "[c]ervical herniated nucleus pulposus at C5-6." (AR 460.) The neurosurgeon recommended physical therapy and a diagnostic CT scan of the lumbar spine and indicated there was potential for surgical intervention of the cervical spine and lumbar spine if he did not respond positively to physical therapy. (AR 460.)

Plaintiff was then seen regularly by Dr. Mark C. Howard, M.D. ("Dr. Howard"), his primary care provider, from June 17, 2016 to March 22, 2018, (AR 472-558), for a number of ailments, including lumbar degenerative disc disease and cervical myelopathy with cervical radiculopathy. (AR 560.) On August 30, 2016, Dr. Howard noted Plaintiff was participating in physical therapy and was interested in having epidural injections to treat his pain. (AR 553.) His prescriptions for Norco and Gabapentin were refilled. (AR 553.) Dr. Howard noted that Plaintiff plans to consult with a specialist for possible future stem cell therapy and was advised against taking any NSAIDs because it would interfere with circulation at the injection site. (AR 553, 556.)

In a note dated October 21, 2016, Kaleb Cullison, DPT[6] wrote that Plaintiff engaged in physical therapy for back pain in July 2016 and has a history of lumbar spine surgery. (AR 462.) Because of his condition, Plaintiff has "functional limitations" in his ability to lift and sit and walk for prolonged periods. (AR 462.)

In a follow-up appointment on October 31, 2016 with Dr. Howard, Plaintiff reported "significant improvement" in his back pain since starting "Egoscue physical therapy exercises 6 weeks ago" on his own. (AR 550.) The therapy involves "menus" of exercises provided to him by a physical therapist over the phone. (AR 550.) Plaintiff reported he met with a pain management specialist but had declined interventional

---

[6] Doctor of Physical Therapy

therapies (epidural or steroid injections), as well as stem cell therapy, because of his pain improvement.  (AR 550.)  However, Plaintiff stated that his pain is aggravated by prolonged sitting and he is taking Norco for breakthrough pain.  (AR 550.)  His gait was normal; the full extension of the lumbar spine was "near normal" but range of motion with rotation limited to about 30 degrees, and he was moving "all extremities well."  (AR 551.)  Dr. Howard refilled Plaintiff's prescriptions for Norco and Gabapentin but told Plaintiff, he could not "indefinitely refill narcotic analgesics" unless there was "some sort of treatment plan."  (AR 551.)

At his February 22, 2017 follow up visit, Plaintiff sought referral for a second surgical evaluation from neurology and chiropractic care, and sought prescription refills.  (AR 545.)  He described "right radicular pain affecting the right hip, right arm, as well as weakness in the right lower extremity," and he said he was wearing a back brace when sedentary.  (AR 545.)  The treatment notes state Plaintiff was being followed by a pain management specialist and had declined interventional therapies at his previous visit.  (AR 545.)  Although detailed testing was not done, Plaintiff had an antalgic gate but was moving all extremities well.  (AR 546.)  He was provided with a referral to neurological surgery, chiropractor, physical therapy, and radiology.  (AR 547.)  Plaintiff's prescriptions for Norco and Gabapentin were refilled.  (AR 548.)

An MRI of the lumbar spine completed on April 29, 2017 found Plaintiff had "[m]ild to moderate multilevel degenerative changes . . . including an annular fissure within L2-L3 disc."  (AR 570-71.)  It also reported that "there is minimal grade 1 anterolisthesis of L5 on S1 without definite visible pars defect."  (AR 570.)

Thereafter, on May 3, 2017, after viewing his MRI with Dr. Howard, Plaintiff indicated that he wanted to continue with conservative, non-surgical treatment.  (AR 539.)  Dr. Howard noted that Plaintiff was being followed by a pain management team, will start physical therapy and has been compliant with his medications.  (AR 535.)

From July 21, 2017 to April 30, 2018, Plaintiff regularly visited James Halvorson, D.C. for chiropractic care.  (AR 466-531.)  At the initial visit, Plaintiff described his pain

level as a 2 out of 10 (a "dull ache") that could reach 8 out of 10 at its worst in his lower back, right hip, and buttocks with no radiation of pain into his legs.  (AR 530.)  He said that the pain was "constant, every day" and was "getting worse as time goes by."  (AR 530.)  The pain was aggravated by bending, lifting, and sitting or standing for too long and relieved by stretching, massage, trigger point therapy, manipulation, and swimming.  (AR 530.)  Plaintiff also described moderate, level 4 pain in his neck that is "getting worse" and "comes and goes" about 2 to 3 times per week.  (AR 530.)  The treatment goals were to reduce pain levels from 2 out of 10 to 1 out of 10 and to increase strength and flexibility so that Plaintiff could "optimally perform all activities of daily living."  (AR 531.)

During these chiropractic visits, the treatment goals remained the same, and all pain was classified by the chiropractor as "moderate."  (*See* AR 466-531.)  Plaintiff's remarks at these visits varied from "about the same;" "a little better;" and "[e]xcellent, working out at the gym again."  (*See* AR 509, 519, 527.)   On October 20, 2017, Plaintiff remarked that the "treatment always helps," but he still has "stiffness and pain."  (AR 503.)

On November 8, 2017, Plaintiff complained to Dr.  Howard of pain and tightness in the third finger on his left hand and said he may have broken his finger a few months back.  (AR 499.)  The interphalangeal joint of his left middle finger was tender and slightly swollen, and he was unable to completely close his finger while making a fist, so x-rays were ordered. (AR 499, 501.)  The treatment notes state that: "Typically finger pain will improve over time."  (AR 501.)  Plaintiff also complained of "mild sciatic pain when bending his head down or bending forward" and "tight hip flexors."  (AR 499.)  Plaintiff reported he had been receiving epidural stem cell therapy and "PRP" for lumbar pain and requested an "interval MRI" to determine whether or not the treatments had been beneficial.  (AR 499.)  At the time, Plaintiff was no longer taking Gabapentin and was only taking Norco "occasionally" for pain.  (AR 499.)

On November 10, 2017, Plaintiff told the chiropractor that he had not had any "major flare-ups;" but he had "tingling more in his fingers." (AR 497.) Plaintiff also reported tingling and soreness in his fingers on December 1, 2017, (AR 495), December 15, 2017, (AR 493), and April 20, 2018, (AR 466 ("the tingling and pain into the hands is increasing, treatment is helping but it always comes back")).

In a follow-up appointment with Dr. Howard on December 20, 2017, Plaintiff reported he had "[m]ild sciatic pain when bending his head down or bending forward"; he was "occasionally" taking Norco for pain; he was receiving chiropractic treatments which were "very beneficial;" epidural stem cell therapy; and "PRP" for lumber back pain. (AR 488.) Plaintiff also said he "spends much of his days doing self-directed therapy for his back, including sitting in a hot tub, followed by sitting in cold pool water, and exercising at the gym." (AR 488.) The treatment notes further states, "[o]verall back pain has significantly improved." (AR 488.)

On February 3, 2018, a follow-up MRI of the lumbar spine was completed concluding "[s]table mild to moderate degenerative changes of the lumbar spine which are most significant at the L4-L5 and L5-S1 level where there is moderate right neural foraminal stenosis at L4-L5 and mild right neural foraminal stenosis at L5-S1. Stable grad 1 anterolisthesis of L5 on S1." (AR 568-69.)

At his March 22, 2018 visit with Dr. Howard, Plaintiff asked for a letter "stating specific disabilities," because he is unable to care for his special needs child," and his "ex-wife needs assistance vis-à-vis IHSS." (AR 472.) Plaintiff stated "he does self-directed therapy for his back all day long" and is also receiving chiropractic care which he has found "very beneficial." (AR 472.) As in prior visits, he reported "[s]ciatic pain when bending his head down or bending forward." (AR 472.) He stated that his back pain was improving "overall" until very recently when he took a road trip in the car, which made his back pain worse. (AR 472.) Prescriptions for both Gabapentin and Norco are listed as "discontinued" in this treatment note but he takes Norco "occasionally for pain amelioration." (AR 472.) On physical examination, Dr. Howard noted that

Plaintiff's back has a "normal spinal contour [and a] normal sitting posture" but forward flexion was "limited to about 70 degrees."  (AR 474.)  Plaintiff was able to rotate his back "fully in both directions."  (AR 474.)  Additionally, he was able to move "all extremities well," had no obvious neurological abnormalities, and had a normal gait.  (AR 474.)  Dr. Howard's final report in the record, dated May 2, 2018, indicates Plaintiff sought a PT referral for his chronic neck/upper back pain and lower back pain.  (AR 463.)  Plaintiff reported he found chiropractic work for his lumbar back pain "very beneficial" and his complaints, at the time, were discomfort in the right lateral upper extremity of pain/numbness and pain in the right leg and lower back pain.  (AR 463.)

Finally, the record includes a form entitled "Physical Medical Source Statement" that is dated May 4, 2018 that was completed and signed by Carmen Bellofatto ("Ms. Bellofatto") but does not include any of her credentials.  (AR 572-75.)  The form indicates that Ms. Bellofatto provided some therapy, involving gentle stretching and strengthening, to Plaintiff in six sessions from September 9, 2016 through May 4, 2017.  (AR 572.)  According to Ms. Bellofatto, Plaintiff could walk one to two blocks; sit for 10 to 15 minutes; and stand for 15 to 20 minutes but needed to take unscheduled breaks of 30 minutes often and shift positions at will during an 8-hour workday because of pain.  (AR 573.)  She also indicates that Plaintiff could occasionally twist and climb stairs but should rarely lift more than 10 to 20 pounds; never crouch or climb ladders; and rarely stoop.  (AR 574.)  Ms. Bellofatto also reported on the form that Plaintiff had significant limitations with reaching, handling, or fingering; would likely be "off task" about 25 percent of the time; and needed to spend most of the day lying on his back.  (AR 574.)

### 2.    Non-Treating, Non-Examining Medical Opinions

On April 6, 2016, G. Spellman, M.D., an agency physician, reviewed Plaintiff's medical records and concluded he is not disabled and could perform his past relevant work as a consultant, a sedentary job, because he has the residual functional capacity to do the following in an 8-hour work day: occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and or walk for 2 hours; sit for about 6 hours;

13

push and pull to use hand and/or foot controls on an unlimited basis; occasionally climb stairs, balance, stoop, kneel, and crouch or crawl; and never climb ladders.  (AR 98-102.)

On July 14, 2016, K. Vu, an agency physician, on reconsideration, reviewed Plaintiff's medical records and concluded he is not disabled because he has the residual functional capacity to occasionally lift or carry 10 pounds; frequently lift or carry less than 10 pounds; stand or walk for 2 hours and sit for about 6 hours in an 8-hour work day; push and pull hand or foot controls on an unlimited basis except for lift/carry restrictions; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (AR 111-12.)  However, Dr. Vu noted Plaintiff should avoid vibration "due to C3 radiculopathy."  (AR 112.)  He also concluded Plaintiff had no manipulative limitations. (AR 112.)  It was Dr. Vu's opinion that Plaintiff's statements about his symptoms were partially consistent with the medical evidence in the record.  His notations also refer to "improvement," "hip [range of motion] with no pain"; and "no atrophy of quads or calfs." (AR 110.)

**B.    The ALJ Decision**

For the purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to determine whether a claimant meets this definition, the ALJ employs a five-step sequential evaluation.  20 C.F.R. § 404.1520(a).  If the ALJ determines that a claimant is either disabled or not disabled at a step in the process, the ALJ does not continue on to the next step.  *Id.* § 404.1520(a); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).  In brief, the ALJ considers whether the claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe, medically determinable physical or mental impairment . . . or a combination of impairments that is severe" and that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the

listings in the regulations; (4) whether, given the claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(i)-(v). Between steps three and four, the ALJ must assess the claimant's RFC.  *Id.* § 404.1520(e); *Bray*, 554 F.3d at 1222–23; *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).  The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five.  *Bray*, 554 F.3d at 1222.

Here, the ALJ applied the five-step sequential framework to determine that Plaintiff is not disabled.  (AR 41-54.)  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since October 28, 2014, the alleged onset date of disability.  (AR 41.)  At step two, the ALJ found that Plaintiff has the following severe impairments: status post motor vehicle accident October 28, 2014 with degenerative disc disease and degenerative joint disease of the lumbar spine; status post minimally invasive L4-L5 foraminotomy/discectomy surgery; osteoarthritis of the bilateral hips; and degenerative disc disease of the cervical spine.  (AR 41.)  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 44.)  The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that he "can lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours in an 8-hour workday with normal breaks; and push and pull within the lift and carry restrictions. . . can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but can never climb ladders, ropes, and scaffolds.  . . . must also avoid concentrated exposure to wetness, vibration, and hazards such as unprotected heights or dangerous moving machinery."  (AR 44.)

At step four, given Plaintiff's RFC, the ALJ determined that Plaintiff is unable to perform any past relevant work.  (AR 51.)  Finally, considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant

numbers in the national economy that the claimant can perform.  (AR 52.)  Therefore, the ALJ concluded Plaintiff has not been under a disability as defined in the Social Security Act from October 28, 2014 through the date of its decision.  (*Id.*)

<strong>Discussion</strong>

**A.      Standards of Review**

**1.      Standard of Review of Magistrate Judge's Report and Recommendation**

The district court's duties in connection with a Report from a magistrate judge are set forth in Federal Rules of Civil Procedure 72(b) and 28 U.S.C. § 636(b).  The district court "may accept, reject or modify, in whole or in part, the findings and recommendations made by the magistrate."  28 U.S.C. § 636(b); *see Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121–22 (9th Cir. 2003) (*en banc*).  However, the district court must conduct a *do novo* review of any part of the Report that has been objected to.  Fed. R. Civ. P. 72(b)(3).  When no objections to a Report are made, the Court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law.  *Campbell v. U.S. Dist. Ct. for the N. Dist. Of California*, 501 F.2d 196, 206 (9th Cir. 1974); *Johnson v. Nelson*, 142 F. Supp. 2d 1215, 1217 (S.D. Cal. 2001).  Here, Plaintiff filed an objection to portions of the Magistrate Judge's Report; thus, the Court will make a *de novo* determination of those portions of the Report to which objections are made.

**2.      Standard of Review of Commissioner's Final Decision**

Section 205(g) of the Act permits unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. § 405(g).  The reviewing court may enter a judgment affirming, modifying, or reversing the Commissioner's decision, and may also remand the matter to the Commissioner of Social Security for further proceedings.  *Id.*

The scope of the reviewing court is limited; it may only "set aside the ALJ's denial of benefits . . . when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th

Cir. 2007) (internal quotations omitted).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  However, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## B.   The ALJ's RFC Determination

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) (quoting SSR 96–8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996)).  Simply put, a claimant's "residual functional capacity is the most [the claimant] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a)(1).

The ALJ assesses a claimant's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ must consider both relevant medical evidence as well as "descriptions and observations of [the claimant's] limitations from [the claimant's] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by" the claimant, family, friends, or "other persons."  20 C.F.R. § 404.1545(a)(3).  If a claimant has more than one impairment, the ALJ must consider all "medically determinable impairments" in assessing the claimant's RFC.  20 C.F.R. § 404.1545(a)(2).

In this case, Plaintiff alleged several impairments in his application for DIB benefits, including his lower back pain and neck pain.  (AR 211.)  In the decision, the ALJ concluded that Plaintiff's degenerative disc disease and degenerative joint disease of the lumbar spine, osteoarthritis of the bilateral hips, and degenerative disc disease of the cervical spine were severe impairments.  (AR 41.)  Therefore, the ALJ must consider all these impairments in assessing Plaintiff's RFC.

**1.      Whether the ALJ Failed to Consider Relevant Medical Evidence as to Plaintiff's Manipulative Limitations in Hands and Fingers**

First, Plaintiff contends the ALJ mischaracterized the evidence by failing to find any limitations in the use of his hands and fingers in the RFC determination. (Dkt. No. 17 at 8-11.) He argues that the ALJ improperly cherry-picked and ignored findings of his treating physicians and failed to consider the re-interpreted MRI results where there was competent evidence that his cervical disc degeneration impairs his ability to handle and grasp. (*Id.* at 8.) Defendant responds that the weight of the evidence does not support Plaintiff's complaints and he merely points to isolated excerpts of the record to support the manipulative limitations. (Dkt. No. 17 at 14-15.) Defendant points out that the EMG study came back negative revealing only a C3 radiculopathy on the left and C3 radiculopathy symptoms tend to be vague neck and trapezious pain; therefore, Plaintiff has failed to show that C3 radiculopathy was the cause of his hand numbness. (*Id.* & n. 3.) Moreover, Defendant argues the ALJ properly relied heavily on the State agency physicians, Dr. Spellman and Dr. Vu, who were able to synthesize the conflicting medical record. (*Id.* at 11.) Ultimately, Defendant claims that weighing of the evidence is reserved for the ALJ. (*Id.* at 14.)

The Report concluded that substantial evidence supported the ALJ's RFC determination excluding any limitations based on hand numbness or hand pain. (Dkt. No. 18, at 20-21.) In the Objections, Plaintiff argues that the Magistrate Judge's conclusion that the ALJ properly considered manipulative limitations should be rejected because there is ample objective evidence supporting his hand and finger numbness and pain. (Dkt. No. 21.)

"Where evidence is susceptible to more than one rational interpretation, . . . the ALJ's conclusion . . . must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Ultimately, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) ("The ALJ is responsible for

determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.").  However, an ALJ may not "cherry pick" evidence without considering its context in the record.  *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (holding ALJ may not "cherry pick" evidence that disfavors disability without considering its context in record); *Garrison v. Colvin*, 759 F.3d 995, 1017 n.23 (9th Cir. 2014) (ALJ may not "cherry-pick" from mixed results to support a denial) (quoting *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (holding that the ALJ erred in selectively relying on entries in the medical record while "ignor[ing] the many others that indicated continued, severe impairment."); *see also Williams v. Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015) (internal citations omitted) ("An ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination.").

The Court agrees with Plaintiff that the ALJ cherry-picked findings to support his RFC determination that Plaintiff had no manipulative limitations in the use of his hands and fingers.  Most significantly, the ALJ appears to have overlooked or ignored the MRI of his cervical spine dated May 23, 2016 discussed in Dr. Ghosh's July 7, 2016 report which the ALJ credited[7], (AR 47).[8]  In a report dated July 7, 2016, Dr. Ghosh read the films and the report of an MRI of the cervical spine dated May 23, 2016 and commented that the initial report did not mention that the MRI revealed a "5 mm disc protrusion at C5-6 compression the left C6 nerve root.  There is a 3 mm disc protrusion at C5-6 compression the right C6 nerve root."  (AR 459.)  Dr. Ghosh re-iterated that the "symptomatic cervical radiculopathy due to a 4-5 mm disc herniation at C5-6" was missed on the original MRI report.  (AR 460.)  The results of the re-interpreted MRI of

---

[7] The ALJ recounted the results of Dr. Ghosh's physical exam of Plaintiff during the visit on July 7, 2016.  (AR 47.)

[8] The report of the MRI of the cervical spine, dated May 23, 2016, is not in the record and only referenced in Dr. Ghosh's medical report.  (AR 459-60.)

May 23, 2016 is not mentioned by the ALJ, and his failure to consider the MRI of the cervical spine with positive findings as it possibly relates to Plaintiff's hand and finger numbness/pain was error as he failed to consider all relevant evidence in the record when making an RFC determination.  *See* 20 C.F.R. § 404.1545(a)(1); *Banks v. Colvin*, No. 13–cv–05322 BHS, 2014 WL 1912063, *4 (W.D. Wash. May 12, 2014) (ALJ committed reversible error by failing to consider significant and probative evidence of more serious findings in an MRI of the cervical spine).

Next, while the ALJ fully credited and gave substantial weight to Dr. Schumann's opinions, he ignored Dr. Schumann's clinical findings and diagnosis that supported Plaintiff's complaints of hand and finger numbness.  In his decision, the ALJ summarized Dr. Schumann's report of April 18, 2016 as follows: Plaintiff's physical exam was "unremarkable except for back spasm; tenderness of the cervical, thoracic and lumbar spine" and "the remainder of the exam revealed normal sensation to light touch; and normal reflexes.  There was no loss of strength or muscle atrophy in the hands."  (AR 47.)  However, the ALJ ignored Dr. Schumann's findings that Plaintiff's complaint of "bilateral hand numbness" was "symmetric bilaterally and mostly in the 4.5 digits and occasionally the thumb."  (AR 403.)  The ALJ also did not mention that, on physical exam, Dr. Schumann described Plaintiff's cervical spine as abnormal and diagnosed him, *inter alia*, with "[c]ervical spondylosis with myelopathy and radiculopathy", "[c]ervicalgia" and "[u]lnar neuropahy at elbow."  (AR 404.)  The ALJ also neglected to note that Dr. Schumann described Plaintiff as having "progressive numbness in both hand [sic] in the ulnar distribution for the last few months."  (AR 404.)

By failing to consider the re-interpreted MRI of the cervical spine dated May 23, 2016 and selectively citing to his treating physician's reports to support an RFC without any manipulative limitations, the ALJ's RFC assessment of no functional limitations to Plaintiff's hands and fingers are unsupported by substantial evidence in the record.  *See Kenneth A. v. Berryhill*, 3:17-cv-01575-PK, 2018 WL 5929674, at * 5 (D. Or. Sept. 4, 2018) (ALJ's decision not supported by substantial evidence where ALJ ignored

physician's findings supporting the plaintiff's limitations and neglected to fully discuss an MRI and x-rays that revealed multi-level degenerative disc disease).

Moreover, while Defendant defends the RFC determination as supported by the state agency physicians, the Court notes Dr. Spellman's opinion was rendered on April 1, 2016 before the cervical MRI scan of May 23, 2016, (AR 96), and Dr. Vu's July 14, 2016 opinion does not address the cervical MRI scan.  (AR 108.)  Dr. Vu only mentions the EMG conducted which revealed "C3 radiculopathy otherwise normal" and not the MRI of May 23, 2016 which revealed cervical radiculopathy at C5-6.[9]

## 2.    Whether the ALJ Failed to Consider Relevant Medical Evidence as to Plaintiff's Ability to Sit for Prolonged Periods

Plaintiff also argues that the ALJ erred in failing to quantify Plaintiff's ability to sit uninterrupted during the course of an eight-hour day in the RFC assessment.  (Dkt. No. 17 at 4-8.)  Defendant responds that the case was complex and conflicting and the ALJ relied heavily on the State agency medical opinions to synthesize the conflicting medical records and determine an RFC that includes both his limitations and residual capabilities. (Dkt. No. 17 at 11-14.)  The Report concluded that there was no compelling evidence indicating that Plaintiff should avoid prolonged sitting.  (Dkt. No. 18 at 21-25.)  Plaintiff did not file an objection to the Report's conclusion.

After careful review of the record, the Court concludes that substantial evidence supports the RFC finding that Plaintiff has the ability to perform sedentary work as defined under 20 C.F.R. 404.1567(a)[10], which includes his ability to sit six hours in an eight-hour workday.  (AR 44.)

_____

[9] In the briefing, Defendant argues that Plaintiff has failed to link C3 radiculopathy to his hand and finger numbness/pain but fails to address the C5-6 radiculopathy noted by Dr. Ghosh.

[10] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that he "can lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours in an 8-hour workday with normal breaks; and push and pull within the lift and carry restrictions. . . can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but can never climb ladders, ropes, and scaffolds.  . . . must also avoid concentrated exposure to wetness, vibration, and hazards such as unprotected heights or dangerous moving machinery."  (AR 44.)

As noted by the Report, under Social Security Ruling 83-10, "'[o]ccasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. . . ."  SSR 83-10 (emphasis added).  Additionally, Social Security Ruling 83-12 provides that a person who "must alternate periods of sitting and standing", meaning an individual who can sit for a time, but must then get up and stand or walk before returning to sitting, "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)."  SSR 83-12.

The ALJ's RFC assessment means that Plaintiff has the ability to sit for about 6 hours in an 8-hour workday.  *See id.*  The ALJ recounted in detail Plaintiff's medical records related to his low back and right hip pain from around March 2015 to May 2018. (AR 45-52.)  The ALJ recognized the medical evidence to support his low back and hip injury, including the x-ray of the lumbar spine, the MRI of the lumbar spine on November 24, 2015, the MRI of the lumbar spine dated April 29, 2017 and February 3, 2018 as well as x-rays of the pelvis and right hip.  (AR 46, 48, 49.)  The ALJ considered

21cv655-GPC(KSC)

Plaintiff's medical source that diagnosed Petitioner with symptomatic cervical radiculopathy and lumbar radiculopathy. (AR 47.) Due to his pain, Plaintiff sought treatment and engaged in different types of treatment such as physical therapy, chiropractic care, steroid injections, pain management, medication, and Platelet Rich Plasma Autologous Graft injections, which are all documented in the ALJ's decision. (AR 46-51.) Despite the voluminous medical records, no treating medical source opined on Plaintiff's inability to sit for prolonged periods.[11]

There are two medical reports by a Physician Assistant ("P.A.") and a DPT in the record limiting Plaintiff from prolonged sitting. (AR 360, 462.) "Regardless of its source," the ALJ "will evaluate every medical opinion [he or she] receive[s]." 20 C.F.R. § 404.1527(c). The ALJ must consider the opinions from "other sources to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). Other medical sources include nurse practitioners, chiropractors, physicians' assistants, therapists, teachers, social workers, spouses and other non-medical sources. 20 C.F.R. § 404.1513(d)(1). An ALJ may not reject the competent testimony of "non-acceptable" or "other" medical sources without comment. *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). To reject the competent testimony of "other" medical sources, the ALJ must give "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)).

First, around November 28, 2015, Felix Regala, P.A, summarily stated that Plaintiff should avoid prolonged sitting. (AR 57, 360.) However, there is no information as to Mr. Regala's involvement in Plaintiff's treatment. (AR 360.) Second, the brief

---

[11] The Court notes that Plaintiff is challenging the ALJ's review of the relevant medical evidence to support the RFC assessment concerning his lower back and hip pain and not Plaintiff's subjective pain and symptom testimony. (Dkt. No. 17 at 5-8.) The Court notes that the record is full of Plaintiff's complaints of pain due to prolonged sitting but the ALJ's assessment of his subjective complaints of pain is not being challenged.

three sentence statement of Kaleb Cullison, DPT on October 21, 2016 stated that Plaintiff has functional limitations in sitting for prolonged periods based on physical therapy for back pain in July 2016.  (AR 462.)  The ALJ afforded little weight to both these opinions because they were not from physicians, were not a proper function by function analysis, did not consider the entire record, and conflicted with substantial evidence in the record documenting sedentary work limitations.  (AR 49-50.)  The Court concludes that the ALJ provided germane reasons for rejecting the two "other medical source" opinions. Additionally, these "other source" opinions pre-date improvements to Plaintiff's back and hip pain starting in 2016 with dramatic improvements by 2018.

Finally, the ALJ notes that Plaintiff's reports of severe lumbar and hip pain gradually improved over time.  (AR 48, 51.)  Starting in February/March 2016, Plaintiff experienced "great success" from the Platelet Rich Plasma Autologous Graft injections for his lumbar pain and was down to one pill a day from eight pills a day and was then able to do physical activities such as swimming.  (AR 400.)  In October 2016, Plaintiff told Dr. Howard that he had significant improvement to his back pain since engaging in "Egoscue physical therapy" and is taking Norco only for breakthrough pain.  (AR 550.) Because of his pain improvement, he declined interventional therapies and stem cell therapy.  (AR 550.)  In September 2017, Plaintiff reported that he felt "excellent" and had been working out at the gym.  (AR 509.)  In December 2017, he stated that his overall back pain had "significantly improved" due to his self-directed therapies.  (AR 488.)  In May 2018, Plaintiff reported that his chiropractic visits for his lumbar back pain were "very beneficial."  (AR 463.)  Accordingly, the Court concludes that the ALJ considered the relevant evidence and provided substantial evidence to support his RFC assessment concerning his ability to sit for six out of an eight-hour workday and ADOPTS the Report's conclusion on this issue.[12]

---

[12] The Court notes that Plaintiff relies on medical evidence from 2015 and 2016 and does not address improvements to his lower back and hip pain in 2017 and 2018. (Dkt. No. 17 at 5-7.)

### 3. Plaintiff's Subjective Pain and Symptom Testimony

Next, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's reports of pain and numbness related in his hands and fingers. (Dkt. No. 17 at 16-20.)  Defendant disagrees arguing that Plaintiff has failed to show that his allegations of manipulative limitations were supported by the record.  (Dkt. No. 17 at 21-22.)

The Report concluded that the ALJ was not required to provide specific, clear, and convincing reasons to support his conclusion regarding limited use of hands and fingers because Plaintiff had not provided objective medical evidence to support an underlying impairment that might reasonably cause numbness or pain in his hands.  (Dkt. No. 18 at 21.)  However, the Magistrate Judge improperly came to the conclusion that Plaintiff had not provided objective medical evidence of an underlying impairment that might reasonably cause disabling numbness or pain in his hands; that was a determination reserved for the ALJ.

It is well established that if an ALJ determines that 1) a claimant has provided objective medical evidence of an underlying impairment or impairments that could reasonably produce the pain or other symptom testimony, and that 2) the claimant is not malingering, the ALJ "may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (citation omitted).  The inquiry "requires the ALJ to specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony."  *Id.* (internal quotations and citations omitted).

First, the Court concludes that the ALJ erred by failing to make the threshold express determination whether Plaintiff had provided objective medical evidence of an underlying impairment or impairments that could reasonably produce the pain or

numbness in his hands and fingers.[13]  *See Hunt v. Astrue*, No. EDCV 11-1391 RNB, 2012 WL 2805034, at \*1 (C.D. Cal. July 9, 2012) (ALJ erred by failing to make an "explicit determination with respect to the first step of her credibility analysis" especially in light of the fact that the plaintiff had asserted several alleged impairments) (citing *Craig v. Chater*, 76 F.3d 585, 596 (4th Cir. 1996) (reversible error for ALJ to fail to expressly consider threshold question of whether claimant had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged)). However, even if the ALJ's failure to make an explicit determination of the first step of the credibility analysis was harmless, by having failed to consider the re-interpreted MRI of May 23, 2016 revealing cervical radiculopathy at C5-6, the ALJ could not have conducted a proper assessment whether Plaintiff had provided objective medical evidence of an underlying impairment that could reasonably produce his hand and finger pain/numbness.  Therefore, the ALJ erred by failing to make the express determination whether there was objective medical evidence of an impairment that could reasonably cause Plaintiff's manipulative limitations.

In sum, the Court concludes that substantial evidence does not support the ALJ's RFC determination that did not include any functional or manipulative limitations on Plaintiff's fingers and hand due to numbness/pain.

## C.   Remand

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion.  *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  In general, when the Court reverses an ALJ's decision "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir. 2004).

---

[13] While the ALJ concluded that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (AR 45), he also concluded that "[d]iagnostic findings do not substantiate the claimant's complaints of significant bilateral hand numbness."  (AR 47.)  His decision is ambiguous on the threshold question on analyzing subjective pain testimony.

Here because the ALJ failed to consider the relevant medical records to make an RFC determination as well as failed to properly assess Plaintiff's subjective symptom testimony related to his hand and finger pain/numbness, the Court REMANDS the case for further administrative proceedings.  *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) ("where . . .  an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency") (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014)).

### Conclusion

Based on the reasoning above, the Court ADOPTS in part and DECLINES to ADOPT in part the Report.  The ALJ's decision is REVERSED in part and the case is REMANDED for further administrative proceedings consistent with the opinion of the Court.

IT IS SO ORDERED.

Dated:  March 30, 2023

Hon. Gonzalo P. Curiel
United States District Judge